# In the
# United States Court of Appeals
## for the Fifth Circuit

US Inventor Incorporated; Tinnus Enterprises, L.L.C.; 360 Heros, Incorporated; Ramzi Maalouf; Larry Golden; World Source Enterprises, L.L.C.; E-Watch, Incorporated,

*Plaintiffs-Appellants,*

v.

Drew Hirshfeld, in his official capacity Performing the Functions and Duties of the Under Secretary of Commerce for Intellectual Property and Director, United States Patent and Trademark Office,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Texas, Marshall, No. 2:21-cv-47
The Honorable **James Rodney Gilstrap**, Judge Presiding.

## BRIEF FOR PLAINTIFFS-APPELLANTS

MICHAEL CHARLES SMITH
SCHEEF & STONE, L.L.P.
P.O. Box 1556
Marshall, Texas 75671-1556
(903) 938-8900
michael.smith@solidcounsel.com

ROBERT P. GREENSPOON
DUNLAP BENNETT & LUDWIG
333 North Michigan Avenue, Suite 2700
Chicago, Illinois 60601
(312) 551-9500
rgreenspoon@dbllawyers.com

*Counsel for Plaintiffs-Appellants*
*US Inventor Incorporated, Tinnus Enterprises, L.L.C., 360 Heros, Incorporated,*
*Ramzi Maalouf, Larry Golden, World Source Enterprises, L.L.C.*
*and E-Watch, Incorporated*

 COUNSEL PRESS · (866) 703-9373

PRINTED ON RECYCLED PAPER 

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. US Inventor Incorporated (nonprofit); Tinnus Enterprises L.L.C.; 360 Heros, Incorporated; Ramzi Maalouf; Larry Golden; World Source Enterprises, L.L.C.; E-Watch, Incorporated (a wholly owned subsidiary of the Telesis Group).

2. Counsel for Appellants: Robert Greenspoon, Erick Poorbaugh, both of Dunlap Bennett & Ludwig, PLLC (Chicago, Illinois and Richmond, Virginia); Michael Smith of Scheef & Stone (Marshall, Texas).

3. Counsel for Appellee: Employees of the Department of Justice (governmental party – listing not required).

*s/ Robert Greenspoon*

Robert Greenspoon
*One of the Attorneys for Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Appellants, under Federal Rule of Appellate Procedure 34(a) and Fifth Circuit Local Rules 28.2.3 and 34.2, believe that oral argument would aid the Court in deciding this case, which involves complex issues related to Article III standing in actions alleging federal agency noncompliance with Administrative Procedure Act notice-and-comment requirements.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................. ii

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF THE ISSUES...........................................................................1

STATEMENT OF THE CASE................................................................................2

    A. General Summary of Allegations and District Court Dismissal on Standing Grounds ........................................................................................ 2

    B. Structure and Statutory Background of AIA Trials........................................ 6

    C. Effect of the Lack of Promulgated Rules on the Discretionary Factors Governing AIA Trial Institution Decisions.................................................. 9

    D. US Inventor's Pleaded and Proffered Facts About Resource Diversion...... 11

    E. A Different District Court Handling a Mirror Image Case Reached the Opposite Result........................................................................................ 13

SUMMARY OF THE ARGUMENT ....................................................................15

ARGUMENT .......................................................................................................15

    A. Appellate Jurisdiction ............................................................................... 16

    B. Legal Standards and Standard of Review................................................... 17

    C. The District Court Focused on the Wrong Concrete Injury ........................ 18

    D. The District Court Misunderstood Resource Diversion Facts .................... 29

CONCLUSION ....................................................................................................34

CERTIFICATE OF SERVICE .............................................................................37

CERTIFICATE OF COMPLIANCE.....................................................................38

# TABLE OF AUTHORITIES

**Cases**

*Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH*,
  IPR2019-01469, Paper 6 (P.T.A.B Feb. 13, 2020)............................................7, 8

*Am. Anti-Vivisection Soc'y v. USDA*,
  946 F.3d 615 (D.C. Cir. 2020) ................................................. 30, 31, 32

*Apple Inc. v. Fintiv, Inc.*,
  IPR2020-00019, Paper 11 (P.T.A.B. Mar. 20, 2020) .................................. 6, 8, 13

*Apple Inc. v. Iancu*,
  Case No. 5:20-cv-06128-EJD, 2021 U.S. Dist. LEXIS 22608, 2021 WL
  411157 (N.D. Cal. Feb. 5, 2021) ....................................................23

*Arcia v. Fla. Sec'y of State*,
  772 F.3d 1335 (11th Cir. 2014) ......................................................33

*Barrera-Montenegro v. United States*,
  74 F.3d 657 (5th Cir. 1996) .........................................................17

*Campaign Ctr. & Democracy 21 v. FEC*,
  952 F.3d 352 (D.C. Cir. 2020) .......................................................34

*Cuozzo Speed Tech., LLC v. Lee*,
  136 S. Ct. 2131 (2016).................................................................7

*Dania Beach v. FAA*,
  485 F.3d 1181 (D.C. Cir. 2007).......................................................22

*Daves v. Dallas City*,
  984 F.3d 381 (5th Cir. 2020) ........................................................17

*EDF v. EPA*,
  922 F.3d 446 (D.C. Cir. 2019)........................................................34

*Eldredge v. Martin Marietta Corp.*,
  207 F.3d 737 (5th Cir. 2000) ........................................................17

*Facebook, Inc. v. Windy City Innovations, LLC*,
  2020 U.S. App. LEXIS 28187 (Sept. 4, 2020) .........................................35

*Facebook, Inc. v. Windy City Innovations, LLC*,
  953 F.3d 1313 (Fed. Cir. 2020) ......................................................35

*FEC v. Akins*,
    524 U.S. 11 (1998)................................................................31

*Gen. Plastic Indus. Co. v. Canon Kabushiki Kaisha*,
    IPR2016-01357, Paper 19 (P.T.A.B Sep. 6, 2017)....................... 7, 8, 13

*Graham v. Ashcroft*,
    358 F.3d 931 (D.C. Cir. 2004)................................................24

*Gulf Restoration Network, Inc. v. Salazar*,
    683 F.3d 158 (5th Cir. 2012) ................................................30

*Harmonic Inc. v. Avid Tech., Inc.*,
    815 F.3d 1356, 1367 (Fed. Cir. 2016) ......................................7

*In re Lipitor*,
    855 F.3d 126 (3d Cir. 2017) .................................................17

*Little v. KPMG LLP*,
    575 F.3d 533 (5th Cir. 2009) ................................................17

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)................................................... passim

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)...............................................8, 22

*NAACP v. City of Kyle*,
    626 F.3d 233 (5th Cir. 2010) ...............................................32

*NHK Spring Co. v. Intri-Plex Techs., Inc.*,
    IPR2018-00752, Paper 8 (P.T.A.B. Sept. 12, 2018)........................8

*NRDC v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020) ...............................................19

*OCA-Greater Houston v. Texas*,
    867 F.3d 604 (5th Cir. 2017) ...................................... 29, 32, 33

*SAS Inst., Inc. v. Iancu*,
    138 S. Ct. 1348 (2018)......................................................7

*Scott v. Schedler*,
    771 F.3d 831 (5th Cir. 2014) ...............................................33

*Sierra Club v. Marsh*,
    872 F.2d 497 (1st Cir. 1989)................................................20

*Summers v. Earth Island Institute*,
    555 U.S. 488 (2009) ............................................................ 20, 21, 22, 28

*Texas v. Rettig*,
    987 F.3d 518 (5th Cir. 2021) .................................................18

*Texas v. United States*,
    945 F.3d 355 (5th Cir. 2020) .................................................28

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ................................................... 21, 28

*Vitarelli v. Seaton*,
    359 U.S. 535 (1959) ...............................................................24

*Watkins v. United States Bureau of Customs*,
    643 F.3d 1189 (9th Cir. 2011) ..............................................25

**Statutes**

28 U.S.C. § 1295 .........................................................................1

35 U.S.C. § 282 ...........................................................................9

35 U.S.C. § 314(a) ................................................................ 6, 7, 8

35 U.S.C. § 315(d) .................................................................6, 8

35 U.S.C. § 316(a) ...............................................................7, 25

35 U.S.C. § 316(b) ...................................................................11

35 U.S.C. § 318(a) .....................................................................6

35 U.S.C. § 318(b) .....................................................................6

35 U.S.C. § 324(b) .....................................................................8

35 U.S.C. § 324(c) ..................................................................8, 9

35 U.S.C. § 325(d) .................................................................6, 8

5 U.S.C. § 701 - Administrative Procedure Act ........................... passim

5 U.S.C. § 706(1) ....................................................................18

5 U.S.C. § 706(2) ....................................................................18

**Other Authorities**

https://usinventor.org/ptabcomments/ .....................................12

https://www.ipwatchdog.com/2020/11/10/give-inventors-chance-ptab-mustregulated/id=127182/ .................................................................13

Patent Trial and Appeal Board Consolidated Trial Practice Guide (November 2019) ...........................................................................6

Peter J. Pitts, *'Patent Death Squads' vs. Innovation*, WALL ST. J. (June 10, 2015, 7:23 PM), https://www.wsj.com/articles/patent-death-squads-vs-innovation-1433978591...........................................................................5

USPTO PAT. PUB. ADVISORY COMM. MEETING, at 129 (Aug. 14, 2014), https://www.uspto.gov/sites/default/files/documents/ppac_transcript_2014 0814.pdf ...........................................................................5

## Constitutional Provisions

Article III................................................................................. passim

# JURISDICTIONAL STATEMENT

This is an action under the Administrative Procedure Act. (ROA.44 ¶ 6, Amended Complaint, naming general non-patent federal jurisdiction as the basis for the District Court's jurisdiction). In a written opinion on July 13, 2021, the District Court entered judgment of no subject matter jurisdiction on grounds of lack of Article III standing. (ROA.601-13). Appellants timely filed their Notice of Appeal on August 10, 2021. (ROA.614-17). Appellee moved this Court to dismiss for lack of appellate jurisdiction, taking a position that the Federal Circuit has exclusive appellate jurisdiction under 28 U.S.C. § 1295. (Dkt. 00516019831). Appellants opposed, arguing that this case raises issues of compliance with federal law governing agency stakeholder relations, not substantial questions of patent law (*e.g.*, validity or infringement of any specific patent). (Dkt. 00516034447). This Court entered an Order on October 8, 2021, carrying the motion with the case.

# STATEMENT OF THE ISSUES

1.      In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992), the Supreme Court considered Article III standing in the context of "procedural rights," and held that such rights present a "special" case whereby immediacy and redressability need not be shown in the "normal" way. Instead, government inaction on a procedure that may enable future government action against a property interest involves a "concrete interest" that triggers a property holder's standing to sue the

1

government. Thus, the issue presented here is whether a court in an APA injunction action against a federal agency should analyze "concrete injury" for Article III standing by limiting itself to looking for an interest in the interim procedural outcome itself (as the District Court did), or instead by asking if the plaintiffs have a protectible interest in a property right put at greater risk of future cancellation because of the federal agency's challenged conduct (as cases like *Lujan* hold and as Plaintiffs argued).

2.      Whether organizational Article III standing exists for an organization in an APA injunction action against a federal agency, when the organization presented unrebutted evidence that it diverted resources to mitigating allegedly unlawful agency action for its constituency, taking steps that it would not have done had the agency acted lawfully.

## STATEMENT OF THE CASE

### A. General Summary of Allegations and District Court Dismissal on Standing Grounds

Appellants are four patent-owning companies, two patent-owning individuals, and one 501(c)(4) nonprofit that educates and advocates for inventors and inventor rights. (ROA.45-48 ¶¶ 11-20). They brought this action against the person performing the functions and duties of the Director of the United States Patent and

Trademark Office ("USPTO")[1] under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* (ROA.44 ¶ 2, ROA.50 ¶ 22). In their Amended Complaint, Appellants contend that the federal agency run by the Director has not dealt lawfully with its stakeholders. (ROA.43-68). This is therefore an action concerning a federal agency's compliance with laws governing stakeholder relations.

At a finer-grained level, this action concerns whether federal law allows a federal agency to use hidden and unpredictable procedures to build the proverbial front door to an agency adversarial system that lets third parties (often without legal standing of their own) convince the USPTO to take away duly granted invention patents. The agency built (and continues to build) that front door without sufficient input from stakeholders, when the law requires otherwise. That is, the agency failed to implement notice-and-comment rulemaking required by statute. As argued rhetorically to the District Court at the motion hearing, the result of having such an adversarial system amounts to the USPTO now having "one side of the building creating rights and another side of the building destroying rights." (ROA.676:6-11). The USPTO's rejection of relevant stakeholder input on the issue of "how do you build a front door" to the destruction side merited suit because of "how awesome that power is and how carefully it should be utilized." (ROA.676:6-11, ROA.720:19-

---

[1] For simplicity, we hereafter refer to Defendant-Appellee as "the USPTO," though technically the Defendant-Appellee is the agency chief

21). An agency cannot shut out the public, and especially its stakeholders, from decisions that can (and do) threaten those stakeholders' livelihoods or rob them of the fruits of years of their labor.

The District Court's decision correctly explains that the systems in question are called "*inter partes* review" ("IPR") and "post grant review" ("PGR"). (ROA.602). All Patentee-Appellants have been, and/or are in continuing danger of being, involuntarily dragged into "IPR" or "PGR." (ROA.46-48 ¶¶ 14-20). More such persons are among organizational Appellant US Inventor's membership. (ROA.46-48 ¶¶ 14-20). They all alleged that the front doors to IPR and PGR (so-called "institution decision" standards) were built without their input (or anyone's) in significant respects. (ROA.61-62 ¶¶ 67-71).

Though unnecessary to establish standing, Appellants alleged that their notice-and-comment input would have likely caused institution decision standards to be more protective of inventor property rights and more likely to lead to institution denial. (ROA.64 ¶¶ 75-76). Thus, Appellants alleged that their property rights would have better avoided a high risk of cancellation had the agency acted lawfully. (ROA.53-60 ¶¶ 32-61). This was important to them because IPR and PGR cancellation rates (84%) vastly exceed rates of patent invalidation in court challenges (29%). (ROA.52 ¶ 27). In other words, for every four patents that are found to be valid when their owners are provided due process of law in the Article

III court system, only one survives the arbitrary and chaotic IPR or PGR process. (ROA.52 ¶ 27). Appellants explained that they would have more, and more predictable, "off-ramps" from the system if the agency had acted lawfully. (ROA.466, ROA.481, ROA.510-13; *see also* ROA.708:21-24 (stating that Appellants would even be "willing to take the risk [of losing such an off-ramp] to go through notice-and-comment rulemaking because we think it can be done so much better")). Consistent with all of this, the highest ranking USPTO judge, and one former appellate court judge, are each on record calling IPR tribunals "patent death squads" compared to conventional district court tribunals.[2]

The District Court nonetheless found that no plaintiff had Article III standing. (ROA.601-13). For patent owners, the District Court could not discern any legally protectible interest belonging to a patent owner in a particular institution decision coming out one way versus another. (ROA.608-09). In so holding, the District Court did not address increased risk to property rights intrinsic to a patent under challenge (aside from mere acknowledgment that Appellants made the argument, ROA.607).

---

[2] In 2014, the then-Chief Judge of the PTAB, James Smith, went on record stating that, in his opinion, "the purpose of [PTAB] proceedings is [to be] death squads." USPTO PAT. PUB. ADVISORY COMM. MEETING, at 129 (Aug. 14, 2014), https://www.uspto.gov/sites/default/files/documents/ppac_transcript_20140814.pdf ; *see also* Peter J. Pitts, *'Patent Death Squads' vs. Innovation*, WALL ST. J. (June 10, 2015, 7:23 PM), https://www.wsj.com/articles/patent-death-squads-vs-innovation-1433978591 (noting that the then-Chief Judge of the Federal Circuit, Randall Ray Rader, criticized the PTAB for "acting as death squads, . . . killing property rights").

For the organization, the District Court gave no weight to the record evidence showing that the lack of agency notice-and-comment led to its diversion of resources. (ROA.609-13). The following sections address the statutory, regulatory, and factual backdrop in greater detail.

### B. Structure and Statutory Background of AIA Trials

The USPTO administers patentability trials under the America Invents Act of 2011 ("AIA trials"). Within such trials (once instituted), the USPTO decides if the evidence presented by a petitioner requires cancellation of one or more patent claims. *E.g.*, 35 U.S.C. § 318(a, b). Such AIA trials include IPR ("inter partes review") and PGR ("post grant review").

The administration of such trials occurs in two phases: an institution phase, and (if there is institution) a trial phase. The Director's decision whether to institute (which he has delegated to the Patent Trial and Appeal Board) includes legal and factual determinations, such as the level of merit of a petitioner's unpatentability argument. It also includes discretionary weighing factors (*e.g.*, the impact of numerous factors relating to other court or other USPTO proceedings). *See, e.g.*, 35 U.S.C. §§ 314(a), 315(d), 325(d); Patent Trial and Appeal Board Consolidated Trial Practice Guide (November 2019), available at www.uspto.gov/sites/default/files/documents/tpgnov.pdf; *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (P.T.A.B. Mar. 20, 2020); *Advanced Bionics, LLC v.*

*MED-EL Elektromedizinische Geräte GmbH*, IPR2019-01469, Paper 6 (P.T.A.B Feb. 13, 2020); *Gen. Plastic Indus. Co. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 (P.T.A.B Sep. 6, 2017). But these weighing factors did not arise through notice-and-comment rulemaking. They arose through ad hoc adjudications.

The USPTO has plenary authority, unreviewable on appeal or mandamus, to deny review of any AIA trial petition for any reason. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1367 (Fed. Cir. 2016) ("[T]he PTO is permitted, but never compelled, to institute an IPR proceeding."). "[T]he agency's decision to deny a petition is a matter committed to the Patent Office's discretion." *Cuozzo Speed Tech., LLC v. Lee*, 136 S. Ct. 2131, 2140 (2016). This discretion comes from 35 U.S.C. § 314(a), which "invests the Director with discretion on the question *whether* to institute review." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1356 (2018).

This discretionary authority exists in a requirement-rich statutory framework. The AIA expressly requires that "[t]he Director **shall** prescribe regulations . . . setting forth the standards for the showing of sufficient grounds to institute a review **under section 314(a)** [and] shall consider the effect of any such regulation on the economy, the integrity of the patent system, [and] the efficient administration of the Office." 35 U.S.C. § 316(a)(2), (b) (emphasis added). The word "shall" makes promulgation of regulations mandatory. When Congress gives an agency a

mandatory duty to issue rules on a topic, the agency lacks the authority to set standards through adjudication. *Massachusetts v. EPA*, 549 U.S. 497, 528 (2007).

Despite this, the Director has set section 314(a) "sufficient ground" standards through ad hoc adjudicative decision making, not notice-and-comment rulemaking. The Director made precedential the ad hoc decision in *General Plastic Industrial Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357 (Paper 19) (P.T.A.B. Sept. 6, 2017), to set down about a half dozen weighing factors to govern Board discretion under 35 U.S.C. §§ 314(a) and 324(b-c) in deciding whether the relationship of a petition to other petitions should lead to discretionary denial. The Director made precedential the ad hoc decisions in *NHK Spring Co. v. Intri-Plex Techs., Inc.*, IPR2018-00752, Paper 8, at 20 (P.T.A.B. Sept. 12, 2018), and *Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH*, IPR2019-01469, Paper 6 (P.T.A.B Feb. 13, 2020), to set down about a half dozen weighing factors to govern Board discretion under 35 U.S.C. §§ 315(d) and 325(d) in deciding whether the relationship of a petition to prior art and arguments considered during earlier patent examination, reexamination, or AIA reviews should lead to discretionary denial. The Director made precedential the ad hoc decision in *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11, at 5 (P.T.A.B. Mar. 20, 2020), to set down about a half dozen weighing factors to govern Board discretion under 35 U.S.C. §§ 314(a) and 324(b)

and (c) in deciding whether the relationship to parallel court proceedings should lead to discretionary denial.

### C. Effect of the Lack of Promulgated Rules on the Discretionary Factors Governing AIA Trial Institution Decisions

AIA trials are expensive and often ruinous to defend. In costs and legal fees, patent owners can expect to spend on average $451,000 per patent. (ROA.54 ¶ 35, citing 2017 AIPLA Report of the Economic Survey, at I-163). This sum gets spent just to maintain the status quo of keeping a patent that the law already presumed to be valid. 35 U.S.C. § 282. Patent owners who are dragged into an AIA trial have no upside—the USPTO cannot adjudicate infringement and cannot award damages. AIA trials, once instituted, proceed without a jury and impose about an 84% likelihood of invalidation. (ROA.52 ¶ 26). As noted above, this is much higher than in district court proceedings, which afford more procedural protections, a presumption of validity (including deference due a qualified government agency official presumed to have correctly performed his or her job), and a clear and convincing burden of proof of invalidity. (ROA.52 ¶ 26).

This case is not about destroying AIA trials but improving them. Compared to setting standards through ad hoc adjudications, notice-and-comment rulemaking by administrative agencies provides benefits of public participation and transparency. Rulemaking instills greater predictability by allowing rules to be known in advance, and creating a framework for public scrutiny if agency policy

changes. (ROA.60 ¶ 64). In this case in particular, a Director bestowing a "precedential" designation on an ad hoc adjudication decision can just as easily remove it the next day without notice or comment.[3]

As signaled above, the USPTO sidesteps notice-and-comment rulemaking by relying instead on "precedential" designations of previous ad hoc adjudication decisions. (ROA.62 ¶ 70). The USPTO's cited authority to do this is its own standard operating procedure document that it calls "SOP 2." (ROA.62 ¶ 70). Under SOP 2, the Director permits himself to take up a previously decided institution decision of a three-member Board panel and make it "binding" on future panels of the Board. (ROA.62 ¶ 70). This happens without notice or comment. (ROA.62 ¶ 71, ROA.191-202). This "precedential" designation may be removed, likewise, without any notice to the public or opportunity to comment. (ROA.65 ¶ 78, ROA.201-202). SOP 2 explains that cases in the future having materially identical facts as in a "precedential" decision must be decided by USPTO officials in an identical way, to result in an identical outcome. (ROA.62 ¶ 70, ROA.201). Public "nominations" for precedential status are allowed. (ROA.199). However, the Director retains sole authority to decide, and may do so without such nominations or suggestions.

---

[3] For this reason, the District Court's assumption that adopting the same standards via notice-and-comment rulemaking would not provide Appellants with additional information (ROA.613) fundamentally misapprehends the issues in this case—in such a hypothetical, Appellants would at least know that the standards would not be changed without warning.

(ROA.199-202). Thus, when discretionary factors are the subject of a decision marked (or unmarked) precedential under SOP 2, the making (or rescinding) of agency rules related to the "sufficient grounds" institution decision (how the "front door" to the system is built) usually occurs without public participation.

Restricting stakeholders from participating in this process contradicts Congress's plan. There is simply no way that Congress could have envisioned ad hoc time-constrained adjudicative decisions by randomly assigned USPTO Board panels meeting the requirements of 35 U.S.C. § 316(b). Under section 316(b), the rulemaking process itself must factor in, for each rule, the effect on the economy, the integrity of the patent system, the efficient administration of the USPTO as a whole, and the ability of the USPTO to timely complete proceedings. Only the deliberation and public input that comes from transparent notice-and-comment rulemaking could enable the USPTO to meet such requirements.

### D. US Inventor's Pleaded and Proffered Facts About Resource Diversion

US Inventor has needed to consume time and resources that would not otherwise be spent had there been lawful promulgation of notice and comment regulations. As pleaded in the Amended Complaint at paragraph 12:

> One of the primary ways in which US Inventor accomplishes its mission is to educate the public by providing information about the factors that will lead to a grant, versus a denial, of institution of AIA trials, particularly on discretionary factors. To do so, US Inventor relies (or would rely) on issued regulations published in the Federal Register

11

for notice and comment, ultimately appearing in the Code of Federal Regulations. But the USPTO and its past and current Directors never promulgated any such notice-and-comment regulations on the topic of how discretionary considerations impact "sufficient grounds" for institution decisions. Because the Director's and the USPTO's inaction denied US Inventor access to authoritative and clear key information it wishes to use in its routine information dispensing activities and to fulfill its mission, the USPTO and the Director have inhibited its daily operations. This constitutes organizational injury to US Inventor.

(ROA.45-46 ¶ 12). And as explained in even greater detail in the Declaration of Josh Malone:

Without rules, US Inventor is temporarily forced to advise its members that not participating in the U.S. patent system, reducing investments in inventing, and/or to keeping their inventions secret may now (solely because of AIA trial reviews) be the best way forward for their situation. These mitigation measures undermine our core mission of fostering innovation and helping inventors to achieve the American Dream, build businesses, and create jobs.

(ROA.120 ¶ 26).

In addition, specific activities of US Inventor became necessary in support of its inventor-rights mission only because of the absence of notice-and-comment rules on discretionary standards. In 2020, US Inventor dedicated website resources and personnel time to creating a portal for inventors to deliver their opinions to the Director on their viewpoints about institution phase discretionary decisions, and for notice-and-comment rules (a portal where submitters were free to contravene US Inventor's organizational viewpoint). *See* https://usinventor.org/ptabcomments/. (ROA.471-72). Doing the government's own "notice and comment" job would have

been unnecessary if those rules already existed, and lawful procedures to create those rules already commenced.

Likewise, also in 2020, US Inventor fellow Josh Malone (in his US Inventor capacity) published commentary to inventors on topics germane to the currently-defective "precedential" rule sets: the environment for discretionary denial in view of parallel litigation (*Fintiv* issues) and serial and parallel petitions (*General Plastic* issues). *See* https://www.ipwatchdog.com/2020/11/10/give-inventors-chance-ptab-mustregulated/id=127182/. (ROA.472). This, too, would have been unnecessary if lawful rules already existed.

Third, also in 2020, US Inventor filed a full-blown petition for rulemaking at the agency, in an attempt to persuade the agency to act legally. (ROA.121-40). This as well would have been unnecessary if lawful rules already existed. US Inventor has had to divert resources in ways that it otherwise would not have if the Director had acted lawfully. The failure to issue standards deprived the organization of key information it relied on to fulfill its mission. (ROA.46 ¶ 12).

### E. A Different District Court Handling a Mirror Image Case Reached the Opposite Result

While this appeal was pending, the United States District Court for the Northern District of California (Judge Davila) reached the opposite Article III standing result from Judge Gilstrap. There, a group of technology companies also sued the USPTO. Their case was different enough on the ultimate merits that Judge

Davila disallowed intervention by essentially the same group of parties as here. *Apple v. Iancu*, No. 5:20-cv-06128-EJD, 2021 U.S. Dist. LEXIS 22608, at *14-15 (N.D. Cal. Feb. 5, 2021) (finding it would "radically alter" the tech company suit "challenging the lawfulness of one PTAB precedential rule affecting the discretionary denial of IPR institution" by allowing intervenors to ask the court to "compel the PTO to engage in notice-and-comment rulemaking in order to adopt discretionary factors that the PTAB would consider" when deciding institution).

Crucially, on reaching the merits, Judge Davila rejected the USPTO's argument that the tech companies lacked Article III standing. *Apple v. Iancu*, No. 5:20-cv-06128-EJD, 2021 U.S. Dist. LEXIS 218143, at *11-15 (N.D. Cal. Nov. 10, 2021) (finding injury-in-fact, immediacy and redressability). This ruling hinged on accepting the tech company arguments that they lose a "benefit" of IPR when the USPTO makes it harder to use IPR to kill patents, the mirror image of Appellants' "future risk" when the USPTO makes it easier to kill patents. *Id.* Judge Davila reached the merits instead on an issue not germane here—justiciability. *Id.* at *15-18. The USPTO won on that issue because inquiry into the lawfulness of the

discretionary factors themselves (an issue Appellants do not raise) contravened 35 U.S.C. § 314(d) (the institution decision appeal bar provision). *Id.*

## SUMMARY OF THE ARGUMENT

The District Court erred by focusing on the wrong concrete injury suffered by the patent owners, and failing to apprehend US Inventor's undisputed facts about its resource diversion caused by the unlawful agency (in)action. The District Court confused the issue of where one finds the patent owners' injury by misbelieving that the patent owners complained about institution decision results in a vacuum, and as if time stopped there. In fact, the patent owner Appellants explained their injury as their increased risk to property rights in the absence of their "seat at the table"—an injury that Supreme Court authorities acknowledge to be "concrete injury" for Article III standing purposes. The District Court likewise misunderstood US Inventor's concrete injury allegations as highlighting a category of activities that it would have done anyway as an advocacy organization, in the absence of any record supporting such a conclusion.

## ARGUMENT

It is this Court's solemn duty (as it was the District Court's) to police federal agencies when they do not follow the law. If the USPTO spurned its obligations under the Administrative Procedure Act, who else can call that agency to justice but inventors? Someone must have standing to invoke Article III review of the USPTO's

15

disregard of Congressional rulemaking obligations. Since the Appellants suffered concrete and particularized injury, they qualify. This Court should reverse.

This case concerns the right of the governed to have a voice as to how they are governed and to have known and predictable procedures in place, including procedures tailored to their calling where unpredictability can, and has, resulted in pointless and financially ruinous litigation for several of Appellants. Appellee says that its insistence on ignoring stakeholder input and making arbitrary and unpredictable rules has not injured Appellants because these acts concern procedure rather than outcome. The Supreme Court says otherwise.

## A. Appellate Jurisdiction

Appellants rely on previous briefing (Dkt. No. 00516034447) explaining why there is appellate jurisdiction in the Fifth Circuit. The Court should deny the USPTO's motion to dismiss in favor of the Federal Circuit, since (1) at least one theory of relief (concerning "SOP 2") involves commonplace non-patent litigation over whether a federal agency internal document embodies a "general statement of policy" versus a mandatory rule that agency employees and stakeholders must follow; (2) the theory of relief cited most heavily by the USPTO does not involve an "issue of patent law" since the word "shall" in the Patent Act needs no interpretation; and (3) that theory does not involve a "substantial" issue of patent law, since no specific issued patent will be directly affected by the outcome of this action in terms

of its validity, enforceability or infringement. Appellants' previous motion opposition goes into more detail.[4]

## B. Legal Standards and Standard of Review

This Court reviews dismissals for lack of Article III standing de novo. *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009). Since the District Court decided the motion to dismiss based on undisputed facts, appellate "review is limited to determining whether the district court's application of the law is correct and . . . whether those facts are indeed undisputed." *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996).

Courts have divided the Article III standing rule into three components: injury in fact, causation and redressability. *Daves v. Dallas City*, 984 F.3d 381, 391 (5th Cir. 2020). Only injury in fact is at issue here. To be an injury in fact, a threatened

---

[4] The USPTO's reply brief in support of its motion to dismiss disputes that the Amended Complaint contains one claim with multiple theories. (Dkt. 00516044591, at 3-4). The USPTO makes this argument to circumvent the law's recognition of Fifth Circuit jurisdiction if at least one theory of relief for each claim in this lawsuit can be determined without resolution of a patent law issue. *See In re Lipitor*, 855 F.3d 126, 144-45 (3d Cir. 2017) (holding number of counts is not germane). The USPTO's own "claim counting" decision shows that notwithstanding two "counts" appearing in the Amended Complaint, this suit involves only one "claim." *See Eldredge v. Martin Marietta Corp.*, 207 F.3d 737, 741 (5th Cir. 2000). In *Eldredge*, a putative plurality of claims was actually one, based on "strong factual overlap" between their respective backdrops. *Id.* at 742 (invoking Seventh Circuit authority reasoning that an appellate court "would still have to relearn the same set of facts" if piecemeal appeals hypothetically came out of putatively multiple claims, thus forcing them to be considered a single "claim").

future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) concrete and particularized, not abstract; and (3) actual or imminent, not conjectural or hypothetical. *Id.* Only the second subprong (concrete versus abstract) is at issue here.

"Concreteness" of the injury is analyzed in the context of the underlying cause of action. Here, this is an APA claim naming two statutory grounds: first, under 5 U.S.C. § 706(1) seeking to compel agency action unlawfully withheld or unreasonably delayed; and second, under 5 U.S.C. § 706(2) seeking to set aside agency action taken without observance of procedure required by law. As explained in the points and authorities below, federal agency (in)action that causes future risk to property rights constitutes cognizable concrete injury under all applicable legal standards and under Supreme Court law. This is precisely the mirror image of the issue where Judge Davila in the Northern District of California correctly found tech company standing for parties with the opposite legal interest.

## C. The District Court Focused on the Wrong Concrete Injury

Appellants have standing to bring this action, and the District Court erred to conclude otherwise. This is true both for Patentee-Appellants, and for nonprofit organization Appellant US Inventor. Only one Appellant needs legal standing for the Court to reverse in this regard. *Texas v. Rettig*, 987 F.3d 518, 528 (5th Cir. 2021). Here, all Appellants have standing.

The District Court overlooked the most crucial aspect of the standing analysis. In a case seeking review of an agency's rulemaking activities, when assessing whether there is "concrete injury" among the plaintiffs, the District Court is required to assume that the plaintiffs win on the merits. *NRDC v. Wheeler*, 955 F.3d 68, 77 (D.C. Cir. 2020) ("[F]or purposes of determining standing, we must assume that petitioners will prevail on the merits of their argument."). Put differently, the District Court was required to assume for purposes of the standing analysis that the Director has, in fact, acted unlawfully to evade notice-and-comment rulemaking on discretionary standards for the institution of trial, and that lawful rulemaking would provide better discretionary off-ramps for patentees so they can more often avoid institution of IPR or PGR. *Id.* Likewise, the District Court was required to assume the truth of the Complaint's allegations related to concrete injury. *Lujan*, 504 U.S. at 561 (holding that at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice"). Unfortunately, nothing in the District Court's decision shows compliance with these requirements. Under this framework, the District Court legally erred by failing to conduct the correct analysis. This Court should correct course and reverse.

In *Lujan*, the Supreme Court considered the issue of standing in the context of a "procedural right." 504 U.S. at 572. The Court observed that

> "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interest can assert that right

without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

*Id.* n.7. When a procedural deprivation creates a risk to an existing legal right or interest, that alone suffices to establish "concrete injury." The government causes concrete injury in depriving litigants of notice and comment rights merely from added *risk* to protectible interests. *Sierra Club v. Marsh*, 872 F.2d 497, 503 (1st Cir. 1989) (Breyer, J.) (holding a harm to the environment included "the added *risk* to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision").

Patents are property rights, and those rights are at greater risk when validity disputes get decided in IPR or PGR rather than Article III court proceedings (84% invalidity rate versus 29%). (ROA.52 ¶ 27). Under *Lujan*, even though patent owners "cannot establish with any certainty" that the outcome of notice-and-comment rulemaking will lead to more frequent discretionary denials, that does not matter for standing. *Lujan*, 504 U.S. 572 n.7; *accord Summers v. Earth Island Institute*, 555 U.S. 488, 491-95 (2009) (holding that before the parties settled, forest enthusiasts had standing to bring action for notice-and-comment rulemaking on disposition of

20

fire-damaged timber on government lands, even though they could not guarantee their viewpoints would prevail).

The recent *TransUnion LLC v. Ramirez* decision, 141 S. Ct. 2190 (2021), fully supports Appellants' focus on "future risk." There, the Supreme Court contrasted claims for injunctive relief from claims for statutory damages. Citing several of its earlier cases, the Court reiterated that "a person exposed to a risk of future harm may pursue forward-looking injunctive relief to prevent harm from occurring, so long as the risk of harm is sufficiently imminent and substantial." *Id.* at 2210. So it is here. Likewise, the Court reaffirmed *Lujan* and *Summers*, citing both frequently in the decision. *Id.* at 2203-08. Here, the District Court never cited *Lujan*, *Summers*, or *TransUnion*, even though each appeared prominently in briefing, and never addressed Appellants' "risk of future harm" argument, even though it was at the heart of Appellants' case.

Under these Supreme Court authorities, Patentee-Appellants are easily analogous to *Lujan*'s residents living adjacent to a site for a federally licensed dam. They have a legal interest (a property right) that might be placed at future risk in the absence of their lawfully-required notice and opportunity to comment on future government action. Patentees also analogize to the forest enthusiasts in *Summers* who provably frequented the forest area subject to the regulations. In *Summers*, before a settlement occurred in the case, plaintiffs established concrete injury by

showing that the Forest Service deprived them of notice and comment relating to lands in the Burnt Ridge Project—a location they frequented for recreation. *Summers*, 555 U.S. at 494 ("While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."). Patentee property rights and prospective injury are at least as substantial and concrete as those belonging to the *Summers* enthusiasts, who merely asserted recreational interests in a particular forest's plants and animals. *Id.*

Cognizable concrete injury can only be greater in a case where patentees actually *own* the property affected by deprivation of notice and comment. Property holdings subject to future risk by government procedural lapses have always established concrete injury in the standing analysis. *See, e.g., Massachusetts v. EPA*, 549 U.S. at 522-26 (holding that, where a state had a property interest in coastal property affected by global warming and the EPA would be more likely to take steps to regulate carbon dioxide if it were to initiate plaintiff's desired proceedings, the state had procedural standing to challenge EPA's failure to initiate rulemaking proceedings related to the regulation of greenhouse gas emissions); *Dania Beach v. FAA*, 485 F.3d 1181, 1184, 1186, (D.C. Cir. 2007) (holding that a person who lived near an airport had procedural standing to seek review of a Federal Aviation Administration (FAA) decision to change runway use without performing the

environmental assessment required by the National Environmental Policy Act (NEPA) because plaintiff had "adequately demonstrated that the FAA's failure to follow the NEPA procedures pose[d] a distinct risk to [plaintiff's] particularized interests given the location of his home").

The District Court overlooked these authorities by giving undue weight to a side issue of little direct relevance. The USPTO had argued that particular institution decisions are not appealable, thus diverting the District Court's focus away from property rights and onto an interim agency procedural event. (ROA.607-08). Ironically, the lack of appealability bolsters the "concrete injury" conclusion. It underscores that patentees suffer when deprived of a "seat at the table" during the creation of any discretionary denial framework, *i.e.*, denied notice-and-comment, because patentees have no right of review for individual decisions. If Patentees cannot comment on the USPTO's ad hoc rules before they are made and cannot appeal institution decisions applying those rules, that only emphasizes the need for the present lawsuit to provide patentees with *some* mechanism for influencing rules that govern their valuable property.[5]

---

[5] As noted, Patentees also attempted to intervene in other litigation where tech companies attempted to change these procedures to make them *even more* anti-inventor, but the district court denied Patentees' request, stating that Patentees "have the option to bring a separate action against the Director." *Apple*, 2021 U.S. Dist. LEXIS 22608, at *19. Judge Davila found that Patentees had this option despite the USPTO asserting the same standing argument that it has in this case (unsuccessfully,

The discretionary nature of individual decisions does not alter this conclusion. Judge Gilstrap reasoned that "Plaintiffs contend they are deprived of additional 'off-ramps' to avoid IPRs and PGRs, but Plaintiffs cannot claim some concrete right or interest in having PTAB panels exercise their discretion in Plaintiffs' desired manner. Such would run contrary to the very notion of discretion." (ROA.608). Congress would disagree. "Plaintiffs' desired manner" in this context is the manner required by law—respecting the command to give stakeholders their "seat at the table." *All* PTAB stakeholders have the concrete right and interest in having PTAB panels exercise their discretion based on factors established through notice-and-comment rulemaking, taking into account the effect on the economy and the integrity of the patent system. 35 U.S.C. § 316(b).

For example, government agencies who start out with broad discretion regularly channel and constrict that discretion through rulemaking. *Graham v. Ashcroft*, 358 F.3d 931, 932 (D.C. Cir. 2004) ("In *Vitarelli* [*v. Seaton*, 359 U.S. 535, 539-40 (1959)], the Supreme Court held that even agencies with broad discretion must adhere to internally promulgated regulations limiting the exercise of that discretion."); *see also Watkins v. United States Bureau of Customs*, 643 F.3d 1189,

---

it turns out). Patentees have exercised this option, only to be told by a different court that they supposedly do **not** have this option after all. These inconsistent holdings place Patentees in a Catch-22—they cannot bring their own action due to a supposed lack of standing, but they also cannot intervene in other actions because they can bring their own action.

1198 (9th Cir. 2011) ("It is a familiar rule of administrative law that an agency must abide by its own regulations.") (citation omitted). In this case, Congress required that very process, under 35 U.S.C. § 316(a)(2). The USPTO should not have been allowed to distract from the presence of Patentee-Appellants' concrete injuries here by exploiting its own failure to issue discretion-channeling regulations to argue that this untrammeled discretion moots any challenge to its violation of stakeholders' procedural rights to rule-based channeling of such discretion. That is classic bootstrapping, and a circular argument that assumes the conclusion.

Most strangely of all, the District Court misunderstood Patentee-Appellants to be complaining about <u>denials</u> of institution in specific instances. (ROA.608-09). That was a double error. Patentee-Appellants were not complaining about specific institution decision results. They complained about being denied a voice when the standards governing discretionary institution were decided. The USPTO built (and continues to build) the "front door" without them. And Patentee-Appellants had no quarrel over agency denials, as opposed to grants, of institution. The District Court's statements that "[t]he decision ***not to*** institute an AIA trial does not affect any substantive rights" and that "[i]n the case of a discretionary ***denial*** [of the institution of an AIA petition], there is no harm to patentees because the proceeding ends," (ROA.608-609). (emphasis added), are especially puzzling because patentees are the

ones who *seek* institution denial.[6] Of course there is no harm to patentees when the USPTO denies institution of an AIA petition, the harm to patentees comes when it applies unlawfully-established procedures to *grant* such a petition. The District Court by its own words misapprehended on which side of the dispute Patentee-Appellants reside.

The District Court then built on this error by claiming that the injury to patentees from being forced to defend unnecessary or improper AIA petitions "has no nexus" to the rules governing when the USPTO allows those petitions to be instituted. (ROA.612-13). While this holding makes no sense in the context of petitions where institution is granted—of course applying improper procedures to allow a challenger to institute a petition has a nexus to the harm to the patentee from litigating that petition—it has some surface appeal if one assumes that Patentee-Appellants were preposterously claiming harm from the petitions where institution was denied and no AIA trial happened. Thus, it appears that the District Court's finding of no harm to Patentee-Appellants rests on its mistaken placement of patentees on the wrong side of the AIA trials. Such a confused premise for the District Court's decision only shows more deeply that the District Court fell victim

---

[6] The District Court was not just trying to be thorough here, as it made no parallel comment about whether there is harm to patentees in the far-more-relevant case where the USPTO grants institution. Imagine how strangely it would have read for the District Court to have stated the equivalent proposition from the other direction – that "petitioners allege no harm from the granting of their petition."

to argument strategies that distracted from the future risk to Appellants' property rights based on deprivation of notice and comment rights.

Likewise, the District Court misidentified the focus of Patentee-Appellants' complaint by assuming that they were only concerned with the expense and annoyance of AIA litigation. (ROA.608-09). The greater concrete injury, as Patentee-Appellants argued, is the risk to property rights (84% versus 29% invalidation rates) from the outcome, not the expense. And this occurred through deprivation of notice-and-comment-rights that would lead to more frequent discretionary denials. (ROA.62-64 ¶¶ 72-76). The District Court also seemed unduly impacted by the USPTO's argument that an institution decision viewed in a vacuum, and if time were stopped there, does not alter a patentee's rights. (ROA.607-09). This misfocused belief ignores what that decision signifies: shunting of a patent dispute from a 29% invalidation rate proceeding (if litigation is pending at all) into an 84% invalidation rate proceeding. The District Court overlooked that discretionary denial is an important mechanism for patentees to avoid near-certain risk of destruction of their property rights.

Standing therefore exists because of future risk of harm from the lack of agency rulemaking, and the District Court erred to believe otherwise. Perhaps confusion ensued because the USPTO argued quixotically that: "Plaintiffs base their supposed standing on the risk of a lawful harm to their interests." (ROA.496). But

at the Rule 12 stage, the harm must be assumed to be based on unlawful action or inaction. *Texas v. United States*, 945 F.3d 355, 383 (5th Cir. 2020). Properly framed, the USPTO offered no rebuttal to Article III injury in fact. Reducing the availability of "off-ramps" to AIA trial institutions constitutes increased risk of future harm, which authorities like *Lujan*, *Summers* and *TransUnion* (and even *Apple v. Iancu*, albeit indirectly) endorse as giving solid ground to standing in injunction cases.

Finally, Plaintiff-Appellant Ramzi Maalouf presented himself as particularly worthy of a favorable Article III standing conclusion. He had raised discretionary arguments against institution of Microsoft's IPR filed against him (IPR2020-00483), but had to do so in the absence of prior notice-and-comment rulemaking on such institution standards. (ROA.48-49 ¶ 18). Microsoft sought IPR, even though no litigation exists on that patent; *i.e.*, there was zero risk outside of this IPR of Plaintiff-Appellant Maalouf's patent being held invalid or cancelled. (ROA.54 ¶ 38). Comparatively, Plaintiff-Appellant Maalouf faced an 84% risk of invalidity or cancellation because of the discretionary institution. (ROA.52 ¶ 27). Plaintiff-Appellant Maalouf's plight met all Article III criteria of injury in fact (increased risk to property interests from 0% to 84%), immediacy (it is happening to him now) and

redressability (the District Court could fix it). Yet the District Court decision never mentions him or his plight.[7]

For these reasons, Patentee-Appellants demonstrated concrete injury for Article III standing purposes. The District Court erred on many levels, induced to focus on the wrong questions. This Court should reverse.

### D. The District Court Misunderstood Resource Diversion Facts

US Inventor also has organizational standing, and the District Court misapplied the law to undisputed facts in the record to find otherwise.

To meet its threshold, US Inventor only had to show an injury in fact that did not even need to be "substantial," as it need not measure more than an "identifiable trifle." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (describing the measure as "qualitative," not "quantitative"). For an organization like US Inventor, it is enough that the complained-of government action has caused the organization to take steps to counteract its effect by trying to mitigate its real-world impact on its members and the public. *Id.* (consumption of time and resources on education that would not otherwise be spent absent the challenged action). As long as the present litigation "is germane to the purposes of [the] organization," US

---

[7] Nonprofit US Inventor pleaded associational injury based on its membership situated in like ways to the Patent Owner Plaintiffs. (ROA.46 ¶ 13). The USPTO never questioned this associational injury, nor that it renews constantly, if Patent Owner Plaintiffs' allegations sufficed to establish their own standing.

Inventor has organizational standing. *Gulf Restoration Network, Inc. v. Salazar*, 683 F.3d 158, 168 (5th Cir. 2012). This comports with the law in other circuits, like the D.C. Circuit, which has held that an agency's failure to enact standards that impairs an organization's interests by depriving it of key information relied upon to fulfill its mission suffices to demonstrate the organization's legal standing. *Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 619 (D.C. Cir. 2020) ("*AAVS*").

US Inventor amply met the threshold for legal standing. It demonstrated that it needed to consume time and resources that would not otherwise be spent had there been lawful promulgation of notice and comment regulations. As pleaded in the Amended Complaint at paragraph 12, it needed (but did not have) notice-and-comment rules to teach its membership about how to invoke a discretionary denial based on proper, legally-sound, and stable rules. (ROA.45-46 ¶ 12). And as one of US Inventor's leaders testified, US Inventor was thereby forced into "mitigation measures [that] undermine our core mission of fostering innovation and helping inventors to achieve the American Dream, build businesses, and create jobs." (ROA.120 ¶ 26).

Specific activities of US Inventor also became necessary in support of its inventor-rights mission only because of the absence of notice-and-comment rules on discretionary standards. This is just like the *AAVS* nonprofits who had to undertake additional work for their mission because the USDA disregarded Congress by not

regulating birds. This included US Inventor's dedicated website and personnel time to the opinion-portal. (ROA.471-72). This would have been unnecessary if those rules already existed. Publications in 2020 would have been unnecessary if lawful rules already existed.

And Appellant US Inventor also showed "informational injury." This is a type of injury that gives rise to standing for organizations when a plaintiff has been deprived of information that a statute requires the government to disclose, and it suffers (through such denial) the type of harm Congress intended to prevent by requiring disclosure. *FEC v. Akins*, 524 U.S. 11, 21-23 (1998). The D.C. Circuit has specifically found organizational standing in the context of an agency's inaction over many years in promulgating required regulations, because of the absence of required and Congressionally-mandated information that would be published in the form of agency regulations. *AAVS*, 946 F.3d at 619.

For example, in *AAVS*, the USDA caused informational injury to animal welfare nonprofit organizations interested in the care and welfare of birds, by failing to promulgate required regulations on the appropriate handling of birds. *Id.* The "failure to issue standards" alone caused sufficient concrete injury based on that being inaction depriving the organization of key information it relied on to fulfill its mission. *Id.* The District Court, however, misinterpreted *AAVS* to recite additional facts (such as the organization's creation themselves of bird welfare standards) as

key to its finding of "concrete injury." (ROA.610). Yet the decision does not support this conclusion. Under the rationale of *AAVS*, rule-nonpublication alone stood as its own source of concrete injury to the organization. Thus here, just like bird regulations at the USDA, lawful regulations on the subject of standards for discretionary denial have not yet issued. This has harmed US Inventor as an organization, forcing it to divert resources to collecting and disseminating information it would otherwise never have done.

Perhaps the District Court gave weight to the USPTO's miscitation of *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010), when the USPTO argued that US Inventor must show "significant" resource diversion and service impairment for Article III standing. (ROA.342, 606). However, the *City of Kyle* Court's reference to the NAACP's "significant" diversion of resources found that such a diversion was *sufficient* to establish standing, not that it was *necessary* to establish standing. This Court made this clear in *OCA-Greater Houston v. Texas*, when it held that "Article III injury-in-fact need not be substantial," and that its remarks in *City of Kyle* were not "a heightening of the *Lujan* standard, but an example of how to satisfy it by pointing to a non-litigation related expense." 867 F.3d 604, 612 (5th Cir. 2017). This Court also reaffirmed that injury for standing "need not measure more than an identifiable trifle." *Id.*

In short, contrary to the District Court's conclusions, US Inventor has Article III standing. US Inventor diverted resources to educational efforts on the topic at hand, to help its inventor-membership deal with PTAB unclarity, instability and opacity in its standards—actions not otherwise needed had the agency acted lawfully. (ROA.471-72). This diversion of resources is injury that qualifies for organizational plaintiff standing. *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341-42 (11th Cir. 2014) (organizations diverted resources to address misidentification of citizenship); *Scott v. Schedler*, 771 F.3d 831, 836-39 (5th Cir. 2014) (NAACP spent additional time on registration drives); *OCA*, 867 F.3d at 612 ("not large" injury resulting from extra time spent educating voters about a new voting law).

The District Court was correct in one regard, insofar as expenditure of resources on advocacy alone is usually not enough to show an organization's Article III injury. But that was not the sole argued basis for organizational standing here. For example, the otherwise-unneeded creation of the web portal facilitated membership to give comments to the USPTO on viewpoints about discretionary institution. (ROA.471-72). This diversion of IT resources was not merely the organization's advocacy, since membership was free to comment inconsistently with US Inventor's position. Likewise, the record included US Inventor's pre-litigation intra-agency petition for rulemaking (filed August 27, 2020), which was never under

review in this lawsuit, and was not generated for purposes of this litigation. (ROA.121-40). It was a pure mitigation effort to address the problem directly.

Put succinctly, on informational injury, the content of notice-and-comment rules can indeed be the kind of information whose absence can trigger such injury. "'The law is settled that a denial of access to information qualifies as an injury in fact where a statute (on the claimant's reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them.'" *Campaign Ctr. & Democracy 21 v. FEC*, 952 F.3d 352, 356 (D.C. Cir. 2020) (quoting *EDF v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019)). With lawfully promulgated rules in place, Appellant US Inventor will be able to communicate to membership definitively, pointing to stable rules built using wise inventor-input, how to use the discretionary denial "off-ramp" to avoid harassment by inappropriate AIA trials.

## CONCLUSION

Our democracy is based on the principle of the rule of law. The APA enshrines our nation's core value that the governed have a say in how they will be governed. Here, the USPTO denied Appellants any voice in determining the procedures that will make or break their livelihood, and further denied Appellants any mechanism for ensuring that the procedures will not be changed at a moment's notice. That this deprivation is unlawful cannot be denied—the Federal Circuit has already noted that

it is (insofar as "precedential" Board decisions amount to rules promulgated without notice and comment). *Facebook, Inc. v. Windy City Innovations, LLC*, 953 F.3d 1313, 1339-43 (Fed. Cir. 2020), *reinstated on reh'g in relevant part*, 2020 U.S. App. LEXIS 28187 (Sept. 4, 2020).

The USPTO's procedural lapses foment instability over the validity of property rights, and thus drive Appellants out of the very patent system that was created to ***foster*** innovation. (ROA.120). Our nation needs more ingenious solutions to intractable problems, not fewer. To hold that procedural violations cannot harm Appellants because the harm comes at a future stage of the process is to take a narrow view of redressable injury that contradicts binding precedent. *E.g.*, *Lujan*, 504 U.S. at 572 n.7 (holding that a violation of procedural rights involves a "concrete interest" when it may enable future government action against a property interest). Under binding precedent, the Court should reverse the dismissal order and remand the case for consideration on the merits.

Dated: November 24, 2021

Respectfully submitted,

_/s/Robert P. Greenspoon_
Robert P. Greenspoon
DUNLAP BENNETT & LUDWIG
333 North Michigan Avenue, Suite 2700
Chicago, Illinois 60601
(312) 551-9500
rgreenspoon@dbllawyers.com

Erick Poorbaugh
DUNLAP BENNETT & LUDWIG
8003 Franklin Farms Dr.
Suite 220
Richmond, VA 23229
(804) 404-9482
epoorbaugh@dbllawyers.com

Michael Charles Smith
SCHEEF & STONE, L.L.P.
P.O. Box 1556
Marshall, Texas 75671-1556
(903) 938-8900
michael.smith@solidcounsel.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of November, 2021, a true and correct copy of the foregoing was filed electronically using the CM/ ECF system. I further certify that all parties are registered CM/ECF users are that service will be accomplished through the CM/ECF system.

*/s/ Robert P. Greenspoon*
Robert P. Greenspoon

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,291 words. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in font size 14 point Times New Roman.

November 24, 2021

*/s/ Robert P. Greenspoon*
Robert P. Greenspoon
One of the Attorneys for Appellants